Lynskey v Bunch (2025 NY Slip Op 51786(U))

[*1]

Lynskey v Bunch

2025 NY Slip Op 51786(U)

Decided on November 10, 2025

Supreme Court, Albany County

Lynch, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 10, 2025
Supreme Court, Albany County

Matthew C. Lynskey, Plaintiff,

against
Marjorie E. Bunch, M.D., Albany Medical Center and 
 Albany Medical Center Hospital, Defendant.

Index No. 904657-24

The New York Injury & Malpractice Law Firm, P.C. 
By: John Fischer, Esq.
278 Wall Street 
Kingston, NY 12401
Kaufman Borgeest & Ryan LLP
By: Ryan Gerspach, Esq.
Patrick A. Dolan, Esq.
Attorneys for Defendants 
69 State Street, Suite 1200E 
Albany, New York 12207

Peter A. Lynch, J.

INTRODUCTION
This is a medical malpractice action, arising out of plaintiff's claim that defendants failed to timely recognize, diagnose, and treat plaintiff's malignant brain tumor. Defendants moved for summary judgment to dismiss the complaint on the grounds that Plaintiff failed to meet its burden to establish a medical malpractice cause of action, claiming, "plaintiff, Matthew Lynskey, did not suffer any injury as a result of any alleged malpractice by defendants."[FN1]
Plaintiff opposes the motion, and filed a cross-motion for leave to serve a late expert disclosure [*2]identifying and disclosing a neurosurgical expert witness.[FN2]
Defendant opposed plaintiff's motion for leave to serve a late expert witness response.[FN3]

FACTS
From 2017 to October 2023, plaintiff was under the medical care and treatment of Dr. Bunch at AMCH.[FN4]
On March 2, 2021, plaintiff underwent an MRI examination.[FN5]
Thereafter, plaintiff claims defendants departed from the accepted medical standard of care and treatment, causing plaintiff to injuries.[FN6]

PLAINTIFF'S DEPOSITION [FN7]

In 2003, when he was in Eighth Grade, plaintiff sustained a brain injury, requiring surgery, because of a Skiing accident.[FN8]
 Plaintiff graduated from Siena College in 2012.[FN9]
 Plaintiff was gainfully employed but stopped working in 2023 due to onset of seizures.[FN10]
 Plaintiff went on disability and his parents handle his finances.[FN11]
 Plaintiff acknowledged having undergone brain surgery, suffers seizures, has memory problems, and takes medication monitored by his parents.[FN12]

In 2017, plaintiff started as a patient with defendant Dr. Bunch.[FN13]
 Plaintiff did not recall Dr. Bunch discussing the results of an MRI, nor telling him in 2021, that he needed to repeat the MRI in one year.[FN14]

In 2023, plaintiff went to a 28-day inpatient alcohol treatment program.[FN15]
In the summer of 2023, plaintiff was assaulted, requiring medical treatment.[FN16]

Plaintiff does not recall the events leading up to being diagnosed with a brain tumor.[FN17]
In the Fall of 2023, he went to Dr. Bunch, and she dismissed his complaints.[FN18]
He acknowledged undergoing chemotherapy.[FN19]

 DEPOSITION OF ERIN LYNSKEY [FN20]

Erin is plaintiff's sister and moved back home in May 2024 to assist her family in the care of her brother.[FN21]
In the Fall of 2023, after the brain tumor surgery, plaintiff has lived at home with his parents, but prior thereto he had an apartment.[FN22]
Erin was in regular contact with plaintiff until 2023, when plaintiff's behavior became erratic, with memory loss and deteriorating physical condition.[FN23]
She acknowledged plaintiff had epilepsy his whole adult life.[FN24]
She noted plaintiff's severe weight loss and recurring head pain in 2023.[FN25]

She recalled plaintiff had a skiing accident when he was 13, that he sustained a traumatic brain injury and suffered a stroke, and a resulting left sided paralysis.[FN26]
The conditions worsened in 2023.[FN27]
Plaintiff also complained of increased head pain in mid-2022 to 2023.[FN28]
In 2022, plaintiff complained that defendant Dr. Bunch was not taking his complaints seriously.[FN29]
She [*3]testified that Dr. Bunch refused to have plaintiff undergo a CT-Scan of MRI for years.[FN30]
She was aware that plaintiff underwent treatment for alcohol addiction in 2021.[FN31]
In 2023, she learned for the first time that plaintiff had undergone an MRI in 2021.[FN32]

DEPOSITION OF JOHN LYNSKEY [FN33]

John is plaintiff's father. Plaintiff has lived with his parents since 2023.[FN34]
Plaintiff sustained a traumatic brain injury on January 28, 2003, resulting in hemiparesis on the left side.[FN35]
Plaintiff was accepted into a master's program in 2022, but as of 2023 he had memory loss.[FN36]
Plaintiff exhibited memory loss in 2021, and fatigue between 2015 and 2020.[FN37]

Plaintiff underwent rehabilitation for alcohol and marihuana abuse two times.[FN38]
Plaintiff first experienced seizures in 2013.[FN39]
Dr. Bunch treated plaintiff for seizures.[FN40]
He recalled plaintiff complained of blurry vision.[FN41]
He did not have any knowledge that plaintiff underwent an MRI of the brain in 2021, and only learned of same in 2023.[FN42]

Plaintiff was under Dr. Bunch's care and treatment from 2017 to 2023, and during that time he complained of headaches.[FN43]
Since 2003, plaintiff had experienced delusions.[FN44]
Plaintiff's [*4]cancer diagnosis is terminal.[FN45]

Plaintiff complained to Dr. Bunch that he experienced continuous hiccups.[FN46]
He recalled Dr. Adamo advising the tumor was smaller as depicted in the 2021 MRI.[FN47]
He felt that Dr. Bunch was dismissive of complaints that plaintiff made.[FN48]

DEPOSITION OF DIANE LYNSKEY [FN49]

Diane is plaintiff's mother. Between 2019 and 2023, plaintiff lived independently and then moved back in with his parents.[FN50]
In 2019, plaintiff fell and suffered a fracture of his right leg.[FN51]
He has previously suffered a traumatic brain injury and experienced a hemorrhagic stroke, with resulting left side hemiparesis because of a skiing accident.[FN52]
Plaintiff was diagnosed with epilepsy in 2013 and started treating with Dr. Bunch in 2017.[FN53]

In May 2023, she went with plaintiff to see Dr. Bunch for a complaint of hiccups, headaches, nausea, vomiting, GI issues; in response to her request for an MRI, Dr. Bunch told her there was a prior MRI and no need for another one; she thought Dr. Bunch was referring to an MRI from the 2003 skiing accident.[FN54]
In 2022, plaintiff was not comfortable discussing his treatment with Dr. Bunch, and she observed Dr. Bunch was not engaging.[FN55]
AMCH was also dismissive.[FN56]
One week before the tumor was diagnosed, they went to Saratoga Hospital due to the head pain and symptoms, called Dr. Bunch, and she advised them to have an MRI.[FN57]
The MRI took place at AMCH and plaintiff was then advised he had a brain tumor the size of a golf [*5]ball.[FN58]
They met with Dr. Adamo, who showed them the MRI from 2003, 2021 and 2023, and he advised they would have to do a biopsy.[FN59]
She was shocked about the 2021 MRI because they did not have any knowledge it had taken place, and she learned the tumor was distinct from the 2003 injury.[FN60]

DEFENDANT BUNCH DEPOSITION [FN61]

Dr. Bunch was Board Certified in neurology in 2010, with a practice focus of 85% epilepsy and 15% neurology.[FN62]
She treated plaintiff for seizure disorder at the neurology clinic at AMCH.[FN63]
Dr. Bunch did not recall the "specifics" of any meeting with plaintiff.[FN64]
Dr. Bunch's first visit with plaintiff was on October 27, 2017, and she had reviewed his prior medical record, including the traumatic brain injury plaintiff sustained when he was 13 years old.[FN65]

Dr. Bunch reviewed a 2017 CT scan, which indicated scarring, an enlarged right ventricle and dead brain tissue located in the right frontal and lenticulostriate regions (a deeper region consisting of part of the white tissue of the brain), attributable to the prior traumatic brain injury.[FN66]
 Dr. Bunch did not recall whether she reviewed any of the images from the 2017 CT scan.[FN67]
At the initial meeting, Dr. Bunch elected to increase plaintiff's seizure medicine.[FN68]

Dr. Bunch's next visit with plaintiff was on April 13, 2018, and indicated she did not know if plaintiff had an MRI prior to 2018.[FN69]
She did not adjust his medications but referred plaintiff to PT due to gait problems.[FN70]

Plaintiff's next visit with Dr. Bunch was on September 25, 2019, and no treatment [*6]changes were made.[FN71]
Plaintiff's next visit with Dr. Bunch was on October 21, 2020, and she changed his treatment from a short-acting formulation of Lamotrigine to a long-acting formulation of Lamotrigine (an anti-seizure medication).[FN72]

Plaintiff's next visit with Dr. Bunch was on February 4, 2021, which she described as an urgent visit due to a seizure, along with new symptoms consisting of blurry and double vision, as well as observing his right pupil smaller than his left pupil.[FN73]
Dr. Bunch ordered an MRI of the brain and an MRA of the head, which was performed on March 2, 2021.[FN74]
Dr. Bunch described the findings of the MRI as,
No acute intracranial findings, regional encephalomalacia right frontal lobe/corono radiata. Basal ganglia region at isula."[FN75]
There were new findings that were not present in the 2017 CT scan, including the possibility of a tumor.[FN76]
On March 3, 2021, Dr. Bunch called plaintiff to advise the MRI finding and indicated "repeat in one year."[FN77]
 (Emphasis added) Dr. Bunch testified:
Q. Did you have any discussion with Matthew about the possibility of a tumor or cancer?
A. Yes.
Q. What was the discussion that you had with him about a tumor or cancer?
A. I read the report. I said, I don't know what's there. We'll repeat it because I don't know.
Q. When you say we don't know what's there, do you mean the finding, the abnormal finding that was in the right parietal lobe of the brain?
A. Correct.
Q What was your differential diagnosis for Matthew with respect to that finding in the right parietal lobe?
A. I didn't have a prior MRI to compare to, so one possibility was that it was scarring that wasn't seen well on the CAT scan but it's better seen on the MRI.
Q. Anything else in your differential diagnosis besides scarring from prior trauma?
A. It could have been a tumor.[FN78]
Dr. Bunch testified that on March 11, 2021, she also advised plaintiff's mother of the foregoing.[FN79]
Plaintiff's next visit with Dr. Bunch was on October 22, 2021.[FN80]
Dr. Bunch did not recall whether she ordered a follow up MRI after the March 2, 2021, MRI, albeit it was still needed.[FN81]

Plaintiff's next visit with Dr. Bunch was on November 21, 2022.[FN82]
She did not discuss a follow-up MRI and was not aware that he had not had a follow up MRI.[FN83]

In March 2023, Dr. Bunch noted that plaintiff's mother called and questioned whether plaintiff had a brain tumor.[FN84]
Plaintiff's next visit with Dr. Bunch was on April 18, 2023.[FN85]
Plaintiff still had not had a follow up MRI, did not discuss the need for a repeat MRI with plaintiff, and Dr. Bunch did not know why.[FN86]
She did not know if the existence of a traumatic brain injury could increase the risk of a brain tumor and/or cancer.[FN87]

Plaintiff's next visit with Dr. Bunch was on May 12, 2023, and it was an urgent visit due to plaintiff being disoriented and weak on his entire left side.[FN88]
 Plaintiff still had not had a follow up MRI and Dr. Bunch did not know why.[FN89]
Dr. Bunch advised plaintiff he needed a follow up to the abnormal MRI done in 2021.[FN90]
Dr. Bunch did not order the MRI, however, claiming plaintiff needed to go to drug rehab.[FN91]

Dr. Bunch was aware that plaintiff was under the care of Dr. Adamo in November 2023, and that he had a brain tumor in the right parietal lobe of the brain.[FN92]

AFFIDAVIT OF JOACHIM M. BAEHRING, M.D., D.Sc.[FN93]

Dr. Baehring offered the following opinion:
"It is my opinion, within a reasonable degree of medical certainty, that plaintiff Matthew Lynskey has not suffered any physical or cognitive deficits proven to be permanent, decrease in chance of cure, or decreased life expectancy, as the result of any malpractice by defendants in this matter. More specifically, it is my opinion, within a reasonable degree of medical certainty, that Dr. Bunch did not depart from the standard of care in her treatment of Mr. Lynskey in 2021—specifically in her treatment plan following the March 2021 brain MRI. It is also my opinion, within a reasonable degree of medical certainty, that Mr. Lynskey returned close to his baseline condition following the tumor resection by Dr. Adamo in November 2023 and appeared on a path to full recovery. Therefore, he has not suffered any injury as a result of any care that Dr. Bunch did or did not render in 2022 or 2023."
Dr. Baehring noted that after the March 2, 2021, MRI, Dr. Bunch ordered a repeat MRI in one year.[FN94]
 The Court notes Dr. Baehring did not specifically address the fact that Dr. Bunch did not order a follow up MRI in March 2022, nor March 2023, nor thereafter. He opined, however, that "Mr. Lynskey has not suffered any psychiatric injury as a result of any treatment that Dr. Bunch did or did not administer in 2022 or 2023."[FN95]
 (Emphasis added) Really! It is undisputed that Dr. Bunch ordered a repeat MRI one year after the March 2, 2021, MRI, and did not do so!
Dr. Baering opined:
77. Aside from his physical and cognitive deficits, Mr. Lynskey also did not suffer any loss of chance of cure or decreased life expectancy as the result of any delayed diagnosis. Most importantly, it is my opinion, within a reasonable degree of medical certainty, that Mr. Lynskey's tumor was the same grade at diagnosis as it was in March 2022. (Emphasis added)
78. After resection by Dr. Adamo in November 2023, much of Mr. Lynskey's tumor was removed. However, astrocytomas are incurable, regardless of when they are diagnosed, because the tumor cells replicate and proliferate on a microscopic level, making complete resection of cancerous cells impossible.[FN96]
The baseline MRI was March 2, 2021, not March 2022, and it appears from the deposition testimony of Dr. Bunch, the tumor grew between March 2, 2021, and 2023.

AFFIDAVIT OF ALEXANDER MERKLER, MD, MS [FN97]

In opposition to defendants' motion for summary judgment, plaintiff submitted the affidavit of Dr. Merkler, a board-certified neurologist. Dr. Merkler opined:
7. On March 2, 2021, an MRI of Mr. Lynskey's brain revealed a new abnormal T2 hyperintensity in the right parietal lobe, which the radiologist specifically reported could represent a low-grade glial neoplasm, recommending followup to ensure stability. The prior CT of 2017 showed no such abnormality, proving this was a new lesion, not chronic post-traumatic change.
8. Despite this explicit warning, Dr. Bunch described the MRI as "generally reassuring", a characterization that is medically inaccurate. A report suggesting a possible brain tumor is not reassuring; it requires urgent follow up.
9. The standard of neurological care mandates: a) Repeat MRI of the brain within 3 to 6 months, not a year, to determine whether the lesion is stable, growing, or malignant; or b) Refer to a neurosurgeon or neuro-oncologist for further evaluation and treatment. Dr. Bunch did neither.
10. Dr. Bunch also failed to follow her own stated plan for ordering a follow-up MRI. Her own procedure required follow-up imaging to ensure stability of abnormal findings. The fact that she ignored her own documented recommendation underscores her deviation from accepted standards of care."
11. Instead, she planned a one-year follow-up, violated her own plan, and did not order any follow-up imaging for two years and seven months, from March 2, 2021, until October 24, 2023 (approximately 941 days). During this period, the tumor silently grew and transformed into a Grade III astrocytoma.[FN98](Emphasis added) There's more! Dr. Merkler continued, as follows:
18. Dr. Bunch has no explanation for why Mr. Lynskey did not undergo a followup MRI for more than two and a half years after March 2, 2021. This prolonged inaction, spanning 941 days, represents a gross deviation from the care expected of a reasonably prudent neurologist.
19. If Dr. Bunch was genuinely uncertain about the meaning of the MRI findings, then follow-up imaging was even more important to monitor the lesion and determine whether it was stable, enlarging, or malignant. Her admitted uncertainty made the need for timely imaging more—not less-urgent.
20. When a neurosurgeon, Dr. Adamo, finally ordered an MRI in November2023, a tumor was clearly present-larger, infiltrative, and exerting mass effect compared with the small, localized lesion of March 2021. That tumor should have been detected, diagnosed, and removed two years and seven months earlier."
Dr. Merkler disputed the findings of Dr. Baehring as follows:
"Dr. Baehring's claim that Mr. Lynskey "returned to baseline" is demonstrably false. Prior to diagnosis, Mr. Lynskey was independent, employed full-time, and cognitively stable. Following resection, he is dependent on his parents, unable to work, and suffers severe memory loss and executive dysfunction."[FN99](Emphasis added) Finding causation from delay, Dr. Merkler opined:
"The lesion observed in March 2021 was consistent with a low-grade, nonenhancing [*7]tumor that was small and potentially resectable. By October 2023, it had transformed into a high-grade astrocytoma with extensive parietal and temporal lobe involvement, rendering gross-total surgery impossible. The 2 years and 7 months of inaction directly enabled this malignant transformation."[FN100]
"Each month of delay increased risk; 941 days (2 years 7 months) of delay erased any chance of cure. The tumor's expansion and mass effect on the October 24, 2023, MRI confirm malignant progression that would not have occurred with timely management."[FN101]

 Clearly, Dr. Merkler's findings and opinions are directly at odds with Dr. Baehring.

 AFFIDAVIT OF JAMES W. HOLSAPPLE, M.D.[FN102]

In opposition to defendants' motion for summary judgment, plaintiff submitted the affidavit of Dr. Holsapple, a board-certified neurological surgeon. Dr. Holsapple opined:
" . . . that the failure to timely diagnose and treat Mr. Lynskey's brain tumor between 2021 and 2023 substantially reduced his chance of a more favorable outcome and longer survival."[FN103]
Dr. Holsapple disputed the findings of Dr. Baehring as follows:
Defense expert, Joachim Baehring (JB) MD opines that the tumor was a Grade Ill astrocytoma in March 2021 implying that earlier diagnosis and resection would not have resulted in the effective treatment of a lower grade neoplasm. Absent a biopsy or examination of excised tissue, it is unknown whether or not Mr. Lynskey harbored a lower grade astrocytoma in March 2021. It is widely recognized that astrocytic neoplasms may undergo transformation to higher grade tumors, a process that is not always predictable and may occur over periods of months or years. It is therefore possible that in March 2021, Mr. Lynskey's significantly smaller brain tumor was less malignant in character than the tumor removed in November 2023 and that surgical treatment at that time would have been less complicated and beneficial.[FN104] (Emphasis added)
Dr. Holsapple opined:
16. It is my opinion, within a reasonable degree of medical certainty, that had Mr. Lynskey's brain tumor been diagnosed and surgically treated immediately following its detection on March 3, 2021, the chance of a complete and safe resection associated with improved survival and functional outcome would have been significantly increased. (Emphasis added)
17. During the 2-year delay between tumor detection on March 3, 2021 and its treatment [*8]in 2023, Mr. Lynskey's tumor significantly enlarged and may have undergone malignant transformation. Regardless of the oncologic state of Mr. Lynskey's tumor in 2021, the delay in treating it significantly reduced the possibility for him to undergo a safe, total and clinically effective resection associated with improved survival and functional outcome.[FN105]
Clearly, Dr. Holsapple's findings and opinions are directly at odds with Dr. Baehring.

 AFFIDAVIT OF PAULA ZUFFANTE, PhD.[FN106]

In opposition to defendants' motion for summary judgment, plaintiff submitted the affidavit of Paula Zuffante, PhD, a licensed clinical neuropsychologist. Dr. Zuffante disputed the findings of Dr. Baehring as follows:
"Dr. Baehring's claim that any delay in diagnosis made no difference in Matthew Lynskey's outcome ignores the well-established principle that tumor progression and neurological injury are time-sensitive phenomena. The tumor's enlargement between March 2021 and October 2023 resulted in greater cortical involvement, seizures, and irreversible neurological deficits."[FN107]

 Clearly, Dr. Zuffante's findings and opinions are directly at odds with Dr. Baehring.
STATEMENT OF LAW-SUMMARY JUDGMENT

In Zuckerman v. New York, 49 NY2d 557, 562 [1980], where the Court held,
"To obtain summary judgment it is necessary that the movant establish his cause of action or defense 'sufficiently to warrant the court as a matter of law in directing judgment' in his favor ( CPLR 3212, subd [b]), and he must do so by tender of evidentiary proof in admissible form. On the other hand, to defeat a motion for summary judgment the opposing party must 'show facts sufficient to require a trial of any issue of fact' (CPLR 3212, subd [b]). Normally if the opponent is to succeed in defeating a summary judgment motion, he, too, must make his showing by producing evidentiary proof in admissible form. The rule with respect to defeating a motion for summary judgment, however, is more flexible, for the opposing party, as contrasted with the movant, may be permitted to demonstrate acceptable excuse for his failure to meet the strict requirement of tender in admissible form." (internal quotations and citations omitted)."
Recognizing that summary judgment is a "drastic remedy" the "facts must be viewed in the light most favorable to the non-moving party (see Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012]) (emphasis added). The Court's function is "not to determine credibility, but whether there exists a factual issue, or if arguably there is a genuine issue of fact" (see S. J. Capelin Associates, Inc. v. Globe Mfg. Corp., 34 NY2d 338, 341 [1974]); see also Sillman v. Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957] where the Court held, "issue-finding, rather than issue-determination, is the key to the procedure" (emphasis added). The evidence must be viewed in the light most favorable to the Plaintiff (see Watts v. Gines, 199 [*9]AD3d 1274 [3d Dept. 2021]).
Summary judgment analysis must be made in context of the relevant burden of proof. In Schwenzfeier v. St. Peter's Health Partners, 2023 NY App. Div. LEXIS 908, p. 3,7 [3d Dept. 2023], the Court identified the relevant burden of proof in a medical malpractice case, holding,
"As the moving parties on their respective summary judgment motions, defendants bore the initial burden of present[ing] factual proof, generally consisting of affidavits, deposition testimony and medical records, to rebut the claim of malpractice by establishing that they complied with the accepted standard of care or did not cause any injury to the patient . . .
As the hospitalist defendants met their prima facie burden, the burden shifted to plaintiff to present expert medical opinion evidence that there was a deviation from the accepted standard of care and that this departure was a proximate cause of [decedent's] injury. In order not to be considered speculative or conclusory, expert opinions in opposition [to a physician's motion for summary judgment] should address specific assertions made by the [physician]'s experts, setting forth an explanation of the reasoning and relying on specifically cited evidence in the record." (Emphasis added; internal quotations and citations omitted)
(See also, In Fuller v Aberdale, 130 AD3d 1277, 1280 [3d Dept. 2015], the court held
"Turning to plaintiff's medical malpractice claims, the burden in a medical malpractice action is to establish both a deviation from accepted practice and that the deviation was a proximate cause of the injury. On a summary judgment motion, a defendant is required to establish through competent evidence either that there was no departure from accepted standards of practice in [the] plaintiff's treatment or that any such deviation did not injure [the] plaintiff. This burden may be satisfied through a physician's affidavit or affirmation describing the facts in specific detail and opining that the care provided did not deviate from the applicable standard of care"
Where, there are competing experts, factual issues, including credibility, should be resolved by a jury (see Marshall v. Rosenberg, 196 AD3d 817, 822 [3d Dept. 2021], where the Court held,
"Plaintiff's expert affidavits raised questions regarding breach of duty and causation. Because the expert opinions of Verra and Robinson conflict with those of Femia and Huang, specifically as to whether a potential diagnosis of BARN is within the purview of a general ophthalmologist and whether Rosenberg should have affirmatively acted to ensure a timely appointment with a specialist, a credibility issue was raised that would be more properly resolved by a jury, rendering summary judgment inappropriate." (Emphasis added; citations omitted)
(See also, Busch v. Sherman, 209 AD3d 1230 [3d Dept. 2022]; Gaughan v. Censeo Health, LLC, 2022 NY App. Div. LEXIS 552 [4th Dept. 2022], where the Court held,
"Although the defense expert attributed plaintiff's injuries to age-related degeneration, the expert failed to account for the absence of pain in plaintiff's spine prior to the accident. Thus, the expert's opinion "was conclusory and therefore 'insufficient to establish that plaintiff's pain might be . . . unrelated to the accident"). (Emphasis added)
Under the foregoing legal standard, let's look at this case.
As a preliminary matter, defendant meet its initial burden to rebut a claim of malpractice, as more fully set forth in the affidavit of Dr. Baehring. Simply stated, Defendant met its prima facie burden of proof by competent evidence that, as a matter of law, there was no departure, nor [*10]any causal relation to plaintiff's injuries. (See cf. Iannillo v. Felberbaum, 198 AD3d 1247, 1251 [3d Dept. 2021]) In turn, Plaintiff clearly established questions of fact through competent medical evidence, consisting of the affidavits of Drs. Merkler, Holsapple, and Suffante, who each disputed Dr. Baehring's opinions, and established a factual basis to support a claim of medical malpractice, and causation of injuries (See e.g., Murgia v. Smith, 190 AD3d 1233, 1237 [3d Dept. 2021]; Johnson v Garcia, 82 AD3d 561 [1st Dept. 2011]).
It bears mentioning that Dr. Bunch testified she ordered a one-year follow up post the 2021 MRI, failed to do so, and offered no explanation as to why she did not follow her own protocol. Stated another way, Dr. Bunch deviated from her own standard of medical care, without any plausible explanation.
In fine, the record demonstrates questions of fact exist as to whether defendants committed medical malpractice in the care and treatment of plaintiff, including but not limited to the delay in recognizing, diagnosing, and treating plaintiff's malignant brain tumor, and whether such delay caused injuries

CROSS MOTION FOR LEAVE TO FILE LATE EXPERT WITNESS RESPONSE [FN108]

Plaintiff seeks leave to serve a late expert disclosure identifying and disclosing the Supplemental Expert response of Dr. Holsapple, as a neurosurgical expert witness.[FN109]

CPLR § 3101 (d) (1) (i), which provides, inter alia:
(d) Trial preparation.
1. Experts.
(i) Upon request, each party shall identify each person whom the party expects to call as an expert witness at trial and shall disclose in reasonable detail the subject matter on which each expert is expected to testify, the substance of the facts and opinions on which each expert is expected to testify, the qualifications of each expert witness and a summary of the grounds for each expert's opinion. However, where a party for good cause shown retains an expert an insufficient period of time before the commencement of trial to give appropriate notice thereof, the party shall not thereupon be precluded from introducing the expert's testimony at the trial solely on grounds of noncompliance with this paragraph. In that instance, upon motion of any party, made before or at trial, or on its own initiative, the court may make whatever order may be just. In an action for medical, dental or podiatric malpractice, a party, in responding to a request, may omit the names of medical, dental or podiatric experts but shall be required to disclose all other information concerning such experts otherwise required by this paragraph.
(ii) In an action for medical, dental or podiatric malpractice, any party may, by written offer made to and served upon all other parties and filed with the court, offer to disclose the name of, and to make available for examination upon oral deposition, any person the party making the offer expects to call as an expert witness at trial. Within twenty days of service of the offer, a party shall accept or reject the offer by serving a written reply upon [*11]all parties and filing a copy thereof with the court. Failure to serve a reply within twenty days of service of the offer shall be deemed a rejection of the offer. If all parties accept the offer, each party shall be required to produce his or her expert witness for examination upon oral deposition upon receipt of a notice to take oral deposition in accordance with rule thirty-one hundred seven of this chapter. If any party, having made or accepted the offer, fails to make that party's expert available for oral deposition, that party shall be precluded from offering expert testimony at the trial of the action.
(iii) Further disclosure concerning the expected testimony of any expert may be obtained only by court order upon a showing of special circumstances and subject to restrictions as to scope and provisions concerning fees and expenses as the court may deem appropriate. However, a party, without court order, may take the testimony of a person authorized to practice medicine, dentistry or podiatry who is the party's treating or retained expert, as described in paragraph three of subdivision (a) of this section, in which event any other party shall be entitled to the full disclosure authorized by this article with respect to that expert without court order. (Emphasis added)
In the Third Judicial Department, the Expert Witness Disclosure rule provides:
"Except as otherwise directed by the court, a party who has the burden of proof on a claim, cause of action, damage or defense shall serve its response to an expert demand pursuant to CPLR 3101(d) on or before the filing of the note of issue. Such party has until the filing of the note of issue to serve such response regardless of how early the demand is made. Any opposing party shall serve its answering response pursuant to CPLR 3101(d) within 60 days after the filing of the note of issue. Any amended or supplemental expert disclosure shall be allowed only with the permission of the court. Unless the court directs otherwise, a party who fails to comply with this rule is precluded from offering the testimony and opinions of the expert for whom a timely response has not been given." (Emphasis added)
Clearly, the cross-motion was made post filing of the trial note of issue, and 26 days before the December 1, 2025, jury trial date certain.
Whether to allow the late filing of an expert witness response rests in the discretion of the Court. In Freeman v. State of New York, 170 N.Y.S.3d 252, 256 [3d Dept. 2022], the Court denied late disclosure 16 days prior to the trial date. Here, however, disclosure was made on November 3, 2025, 26 days before the trial date. In this Court's view, the Holsapple response does not come as a surprise, since it is consistent with the disclosed response of Dr. Merkler, and Holsapple, as an expert in the field of neurosurgery, has responded to the lack of causation claim set forth in the Baehring affidavit (c.f., Schultz v. Albany Med. Ctr. Hosp., 238 AD3d 1286 [3d Dept. 2025]).
In this Court's view, it would be inherently unfair to allow Baehring to testify with respect to the lack of causation, without giving plaintiff a full opportunity to respond. In turn, defendant's objections to Dr. Holsapple's testimony speak to the weight of such testimony, not admissibility.[FN110]

Plaintiff's motion for leave to serve the late supplemental expert witness response with respect to the testimony of Dr. Holsapple is granted.

CONCLUSION
For the reasons more fully stated above, Defendant's motion for summary judgment to dismiss the Complaint is denied, and it is further,
ORDERED, that plaintiff's cross-motion for leave to serve a late expert witness response, Dr. Holsapple, is granted.
This memorandum constitutes the decision and order of the Court.[FN111]

Dated: November 10, 2025
Albany, New York
PETER A. LYNCH, J.S.C.
PAPERS CONSIDERED:
All e-filed pleadings and exhibits.
NYSCEF Doc. Nos. 1 to 77

Footnotes

Footnote 1:NYSCEF Doc No. 48 — Notice of Motion for Summary Judgment; NYSCEF Doc No. 49-Gerspach Affirmation ¶ 10-11.

Footnote 2:NYSCEF Doc No. 65 — Notice of Cross-Motion for leave to serve late expert witness disclosure.

Footnote 3:NYSCEF Doc. No. 77 — Gerspach Affirmation.

Footnote 4:NYSCEF Doc. No. 1 — Verified Complaint ¶ 27, 29, 30.

Footnote 5:NYSCEF Doc. No. 1 — Verified Complaint ¶ 28.

Footnote 6:NYSCEF Doc. No. 1 — Verified Complaint ¶

Footnote 7:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition.

Footnote 8:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 17.

Footnote 9:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 15.

Footnote 10:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 9.

Footnote 11:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 12.

Footnote 12:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 14.

Footnote 13:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 23.

Footnote 14:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 31-32.

Footnote 15:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 32.

Footnote 16:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 34.

Footnote 17:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 34.

Footnote 18:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 36-37.

Footnote 19:NYSCEF DOC No. 51 — Transcript of plaintiff's Deposition p. 40.

Footnote 20:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition.

Footnote 21:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 8.

Footnote 22:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 14-15.

Footnote 23:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 16-17.

Footnote 24:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 20.

Footnote 25:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 21-22.

Footnote 26:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 22-23.

Footnote 27:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 25-26.

Footnote 28:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 30-31.

Footnote 29:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 42.

Footnote 30:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 43-44.

Footnote 31:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 49.

Footnote 32:NYSCEF DOC No. 53 — Transcript of Erin Lynskey's Deposition, p. 67.

Footnote 33:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition.

Footnote 34:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 6.

Footnote 35:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 15-16.

Footnote 36:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 23.

Footnote 37:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 25-26.

Footnote 38:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 32.

Footnote 39:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 37.

Footnote 40:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 37 -38.

Footnote 41:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 40.

Footnote 42:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 41-42.

Footnote 43:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 47.

Footnote 44:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 54-55.

Footnote 45:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 58.

Footnote 46:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p.62.

Footnote 47:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 64-65.

Footnote 48:NYSCEF DOC No. 54 — Transcript of John Lynskey's Deposition p. 67.

Footnote 49:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition.

Footnote 50:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 8.

Footnote 51:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 10.

Footnote 52:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 11-12.

Footnote 53:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 12, 14.

Footnote 54:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 17-20.

Footnote 55:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 43-44.

Footnote 56:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 50.

Footnote 57:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 49.

Footnote 58:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 53.

Footnote 59:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 55-56.

Footnote 60:NYSCEF DOC No. 55 — Transcript of Diane Lynskey's Deposition p. 56-57

Footnote 61:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition.

Footnote 62:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 11-12.

Footnote 63:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 12.

Footnote 64:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 13.

Footnote 65:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 14-15.

Footnote 66:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 15-16, 26-27.

Footnote 67:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 16.

Footnote 68:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 17-18.

Footnote 69:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 20.

Footnote 70:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 21.

Footnote 71:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 22.

Footnote 72:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 23-24.

Footnote 73:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 24-25.

Footnote 74:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 26, 28.

Footnote 75:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 28.

Footnote 76:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 30.

Footnote 77:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 34-35.

Footnote 78:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 36-37.

Footnote 79:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 37-38.

Footnote 80:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 46.

Footnote 81:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 55-57.

Footnote 82:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 57-58.

Footnote 83:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 59.

Footnote 84:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 80.

Footnote 85:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 60.

Footnote 86:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 60.

Footnote 87:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 63.

Footnote 88:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 64-66.

Footnote 89:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 66-67.

Footnote 90:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 67.

Footnote 91:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 68-69.

Footnote 92:NYSCEF Doc. No. 52 Transcript of Dr. Bunch's deposition p. 70-71.

Footnote 93:NYSCEF Doc. No. 50 — Affidavit of Baehring, M.D.

Footnote 94:NYSCEF Doc. No. 50 — Affidavit of Baehring, M.D. ¶ 62-63.

Footnote 95:NYSCEF Doc. No. 50 — Affidavit of Baehring, M.D. ¶ 74.

Footnote 96:NYSCEF Doc. No. 50 — Affidavit of Baehring, M.D. ¶ 77,78.

Footnote 97:NYSCEF Doc. No. 70 — Affidavit of Merkler, M.D.

Footnote 98:NYSCEF Doc. No. 70 — Affidavit of Merkler, M.D. ¶ 7 to 11.

Footnote 99:NYSCEF Doc. No. 70 — Affidavit of Merkler, M.D. ¶ 25.

Footnote 100:NYSCEF Doc. No. 70 — Affidavit of Merkler, M.D. ¶ 30.

Footnote 101:NYSCEF Doc. No. 70 — Affidavit of Merkler, M.D. ¶ 32.

Footnote 102:NYSCEF Doc. No. 68 — Affidavit of Holsapple, M.D.

Footnote 103:NYSCEF Doc. No. 68 — Affidavit of Holsapple, M.D. ¶ 7.

Footnote 104:NYSCEF Doc. No. 68 — Affidavit of Holsapple, M.D. ¶ 8.

Footnote 105:NYSCEF Doc. No. 68 — Affidavit of Holsapple, M.D. ¶ 16 and 17.

Footnote 106:NYSCEF Doc. No. 72 — Affidavit of Zuffante PhD.

Footnote 107:NYSCEF Doc. No. 72 — Affidavit of Zuffante PhD. ¶ 17.

Footnote 108:NYSCEF Doc. No. 65.

Footnote 109:NYSCEF Doc. No. 67 Supplemental Expert Witness Response; NYSCEF Doc. No. 68 — Affidavit of Holsapple, M.D.

Footnote 110:NYSCEF Doc. No. 77 — Gerspach Affirmation.

Footnote 111:Compliance with CPLR R 2220 is required.